UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LUCIOUS WILSON,

            Plaintiff,

     v.

BUCATO, J. FLORES, AND C. HUCKLEBERRY,

            Defendants.

Case No. 1:23-cv-00023-KES-HBK

FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

FOURTEEN-DAY OBJECTION PERIOD

(Doc. No. 51)

Pending before the Court is Defendant' Motion for Summary Judgment. (Doc. No. 58, "MSJ"). For the reasons set forth below, the undersigned recommends that the District Court grant Defendants' MSJ on Plaintiff's excessive force and medical deliberate indifference claims.

## I. BACKGROUND

### A. Procedural History and Allegations in Complaint

On December 30, 2022, Plaintiff initiated this action while confined at California Department of Corrections and Rehabilitation ("CDCR"). (Doc. No. 1). On May 2, 2023, the undersigned screened the complaint, finding that it stated an Eight Amendment claim of excessive against Defendants Bucato, Flores, and Huckleberry. (Doc. No. 9). Specifically, the Court found Plaintiff did "not challenge the use of the O.C. spray. Rather, Plaintiff claims that he

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2023).

was not afforded the opportunity to decontaminate which resulted in him sustaining injuries to his eye." (*Id*. at 5).  On May 30, 2023, Plaintiff filed a Notice to Proceed on Cognizable Claims in accordance with the May 2, 2023 Screening Order.  (Doc. No. 10).  On June 5, 2023 the Court directed service of the Complaint on Defendants Bucato, J. Flores, and C. Huckleberry. (Doc. No. 11).  On August 16, 2023, the Defendants filed a Motion to Dismiss. (Doc. No. 15). The Court denied the motion and noted that the Complaint also adequately alleges an Eighth Amendment claim for medical deliberate indifference against the three remaining defendants. (Doc. No. 21 at 6-9).

In relevant part, the Complaint alleges Plaintiff was not properly decontaminated after being sprayed in the eyes with oleoresin capsicum spray ("O.C. spray") on an unspecified date. (Doc. No. 1 at 3).  Plaintiff alerted Defendant Bucato that his eyes hurt and he "can't see good," but Defendant Bucato did nothing after Plaintiff alerted him to his pain and vision problems. (*Id*.).  After asking Plaintiff to sign a property sheet (form 1083), Sergeant Flores wrote "cannot see due to p.s." but did not get Plaintiff any medical attention or permit him to flush out his eyes. (*Id*.).  Lieutenant Huckleberry refused Plaintiff's request for a "wet cell" with running water. (*Id*.).  Plaintiff remained in a "cage" without being decontaminated for "about 6 ½ hours." (*Id*.).

Due to his inability to decontaminate, Plaintiff claims he suffered unnecessary pain, and temporary blindness and sensitivity to light.  (*Id*.).  He also underwent two "non-invasive procedures" after being seen by three eye specialists and must use eye drops.  (*Id*.).  As relief, Plaintiff seeks $75,000 in compensatory damages and unspecified punitive damages.  (*Id*. at 6).

**B. Defendants' MSJ**

On June 20, 2025, Defendants filed their MSJ.  (Doc. No. 51).  Supporting their MSJ, Defendants submit: (1) a memorandum of points and authorities (Doc. No. 51-1); (2) a statement of undisputed material facts (Doc No. 51-2); (3) the declaration of E. Bucato (Doc. No. 51-3); (4) Exhibits A and B to the Bucato declaration (Doc. No. 51-4); (5) the declaration of D. Hamilton (Doc. No. 51-5); (6) Exhibit C throught J to the Hamilton declaration (Doc. No. 51-6); (7) the declaration of C. Huckleberry (Doc. No. 51-7);(8) Exhibit K to the Huckleberry declaration (Doc. No. 51-8); (9) the declaration of O. Gonzalez (Doc. No. 51-9); (10) Exhibits L and M to the

Gonzalez declaration (Doc. No. 51-10); (11) the declaration of J. Flores (Doc. No. 51-11); (12) Exhibit N to the J. Flores declaration (Doc. No. 51-12); (13) the declaration of Raye Hutslar (Doc. No. 51-13); (14) Exhibit O to the Hutslar declaration (Doc. No. 51-14); (15) the declaration of A. Arjona (Doc. No. 51-15); and (16) Exhibit P to the Arjona declaration (Doc No. 51-16).

Defendants argue that no constitutional violations occurred, and they are entitled to qualified immunity. (Doc. No. 51-1). As to excessive force, Defendants contend Flores's pepper spray use was reasonable with Wilson himself admitting it was justified, while Bucato and Huckleberry used no physical force at all. (*Id*. at 10-11). Regarding failure to intervene, Defendants argue no underlying violation exists, Flores and Huckleberry were absent during the holding cell events, and Bucato actually did intervene by checking on Wilson every fifteen minutes per policy and offering water and restroom breaks.  (*Id*. at 11-13).  On the deliberate indifference claims, defendants assert Wilson received adequate treatment including immediate decontamination, fresh air exposure, clean clothing, and medical evaluation within an hour, with Defendants having no subjective knowledge of any serious risk to Wilson's health. ECF 51-1 at 14-16.  As indicated in prior Court orders, the only issues before the Court are the excessive force and deliberate indifference to medical needs claims regarding Defendants' alleged failure to provide Plaintiff the proper opportunity to decontaminate from the pepper spray.

### C.  Plaintiff's Opposition to Defendants' MSJ

On July 24, 2025, Plaintiff filed his Opposition.  (Doc. No. 54).  In support, he submits a one-page memorandum. (*Id*. at 2). Plaintiff did not file a response to Defendants' undisputed facts but states that "there are numerous material facts in dispute."  (*Id*. at 1).

## II.  APPLICABLE LAW

### A.  Summary Judgment Standard

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be entered "after adequate

3

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Id.* at 323.  An issue of material fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there to be a genuine issue of a material fact.  *See* Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and showed judgment to be appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002).  A mere scintilla

4

of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly supported summary judgment motion. *Anderson.*, 477 U.S. at 252. However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record" courts "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff's verified complaint may serve as an affidavit in opposition to summary judgment if based on personal knowledge and specific facts admissible in evidence. *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc). However, a complaint's conclusory allegations unsupported by specific facts, will not be sufficient to avoid summary judgment. *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001). And, where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those facts. *See* Fed. R. Civ. P. 56(e)(2).

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. The omission to an argument, document, paper, or objection is not to be construed that the undersigned did not consider the argument, document, paper, or objection. Instead, the undersigned thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate for purposes of issuing these Findings and Recommendations.

### B. Excessive Force

Prison officials who use excessive force against an inmate violate his Eighth Amendment right to be free from cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). When determining whether the force was excessive, the court looks to the "extent of injury suffered by an inmate . . . the need for application of force, the relationship between that

5

need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id*. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  While *de minimis* uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.

"With regard to the use of pepper spray, the Ninth Circuit has concluded that the use of pepper spray 'may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force.'" *Pinkston v. Fierro*, 2006 WL 3147685, at *6 (E.D. Cal. Nov. 1, 2006) (citing *See LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000)), *report and recommendation adopted*, 2007 WL 1365407 (E.D. Cal. May 9, 2007), *aff'd*, 315 F. App'x 628 (9th Cir. 2009); *see also Headwaters Forrest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130-31 (9th Cir. 2002) ("[I]t would have been clear to any reasonable officer that defendants' refusal to wash out the protesters' eyes with water constituted excessive force under the circumstances.").[2]

**C. Medical Deliberate Indifference**

The Constitution requires prison officials to provide inmates with reasonably adequate medical care.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  To hold an official liable for violating this duty under the Eighth Amendment, the inmate must satisfy two prongs, an objective prong and subjective prong.  First, the inmate must suffer from a serious medical need (the objective prong); and second the official must be deliberately indifferent to the inmate's serious medical need (the subjective prong).  *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).  A medical need is "serious" if the failure to treat

---

[2] The standards applicable to use of force claims brought under the Fourth and Eighth Amendments are distinct.  As evident by the cases cited here, however, judges in this District routinely apply principles derived from Fourth Amendment case law to Eighth Amendment claims filed by prisoners.

"could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted). The "second prong—defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id*. (internal citations omitted). This standard requires that the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839.

Deliberate indifference is a higher standard than medical negligence or malpractice, and a difference of opinion between medical professionals—or between a physician and the prisoner—generally does not amount to deliberate indifference. *See generally Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (A mere "difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference."). To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson*, 90 F.3d at 332.

Neither will an "inadvertent failure to provide medical care" sustain a claim. *Estelle*, 429 U.S. at 105. Misdiagnosis alone is not a basis for a claim, *see Wilhelm*, 680 F.3d at 1123, and a "mere delay" in treatment, "without more, is insufficient to state a claim of deliberate medical indifference," *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Instead, a prisoner must show that a delay "would cause significant harm and that defendants should have known this to be the case." *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002).

////

## III. ANALYSIS

### A. Undisputed Material Facts

Defendant provides a statement of undisputed material facts. (Doc. No. 51-2). Each listed fact cites to sworn declarations, deposition testimony, and the complaint. (*See* generally *id.*). In his Response, Plaintiff fails to include a response to Defendants' statement of undisputed facts or his own statement of undisputed facts. (*See* Doc. No. 54).

Where Plaintiff's Response argues that Defendant's undisputed facts are inaccurate and his argument is based solely on conclusory statements or the complaint, and lacks detailed facts, while Defendant provides detailed facts or documentary evidence in support, the Court generally does not find Plaintiff's objections sufficient to establish a genuine dispute of material fact. *See Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc); *see also FTC v. Publishing Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Having reviewed the record, the undersigned finds the following facts to be material and undisputed, unless otherwise noted.

- Plaintiff Lucious Wilson is an inmate in the California Department of Corrections and Rehabilitation ("CDCR") and was housed at Kern Valley State Prison ("KVSP") in Delano, California. (Doc. No. 1 at 1).
- At all times relevant to the complaint, Defendants Flores, Huckleberry, and Bucato were employed as correctional staff at KVSP on July 19, 2022. (Doc. No. 1 at 2; Doc. No. 51-11 at 1 ¶ 2; Doc. No. 51-3 at 1 ¶ 2; Doc. No. 51-7 at 1 ¶ 2).
- On July 19, 2022, at approximately 7:40 a.m., Wilson was attacked by inmates Thiehoff, Keene, and Sims in the rotunda of Facility D Housing Unit 6 at KVSP. (Doc. No. 51-14 at 2-30 (Wilson Depo. Tr.") at 32:7-9, 34:4-14; Doc. No.51-8 at 2; Doc. No. 51-5 at 4 ¶¶ 15-16; Hamilton Decl., Ex. E and F, video surveillance footage; Doc. No. 51-4 at 2; Doc. No. 51-12 at 2).
- The attack continued into the rotunda area and moved towards the entrance door of the housing unit. (Doc. No. 51-8 at 2-3; Doc. No. 51-5 at 4 ¶ 16.)

- After the attack, inmates Thiehoff and Sims exited the housing unit and assumed prone positions on the yard. (Doc. No. 51-8 at 2; Doc. No. 51-5 at 4-5 ¶¶ 16-17, Ex. F and G; Wilson Depo. Tr. at 33:3-11, 34:11-14).

- Wilson assumed a seated position in the rotunda, and Keene assumed a prone position, as responding staff entered the rotunda area. Doc. No. 51-8 at 2; Doc. No. 51-5 at 4-5 ¶¶ 16-17; Hamilton Decl., Ex. F.

- At approximately 7:41 a.m., Wilson got up from a seated position to retrieve a red pen that fell off his person during the attack, and again assumed a seated position near the entrance door. (Doc. No. 51-8 at 2; Hamilton Decl. ¶¶ 15- 16, Ex. E and F; Wilson Depo. Tr. at 34:21-25).

- At approximately 7:42 a.m., Wilson got up, ran out of the housing unit onto the yard, pushing Correctional Officer R. Robles out of his way as he ran towards Thiehoff and Sims. (Doc. No. 51-8 at 2; Hamilton Decl. ¶¶ 17- 18, Ex. G and H; Doc. No 51-9 at 2 ¶ 4; Wilson Depo. Tr. at 34:19-20.

- When Wilson reached Sims, still at 7:42 a.m., Wilson began attacking Sims with the red pen, stabbing him repeatedly in the left-side head area. (Doc. No. 51-8 at 2; Hamilton Decl. ¶¶ 17- 18, Ex. G and H; Doc. No. 51-11 at 2 ¶ 4; Wilson Depo. Tr. at 33:12-24).

- Defendant-Correctional Sergeant J. Flores responded to the scene and ordered the inmates to "get down," but they did not comply. (Doc. No. 51-11 at 1-2 ¶¶ 34, Ex. N; Hamilton Decl. ¶ 19-20, Ex.H J).

- Sergeant Flores used an oleoresin capsicum (O.C.) spray device on Wilson, spraying him in the facial area. (Doc. No. 51-8 at 2; Hamilton Decl. ¶¶ 17-20, Ex. G, H,and J; Doc. No. 51-11 at 2 ¶ 6; Doc. No. 51-9 at 2 ¶ 5).

- Sims separated from Wilson and assumed a prone position, but Wilson immediately started running towards Sergeant Flores. (Doc. No. 51-8 at 2; Hamilton Decl. ¶¶ 17- 20, Ex. G, H,and J; Doc. No. 51-11 at 2 ¶ 7).

- Sergeant Flores continued to use his O.C. spray on Wilson until he assumed a prone position on the ground. (Doc. No. 51-8 at 2; Hamilton Decl. ¶¶ 17- 20, Ex.H,and J; Doc.

No. 51-11 at 2 ¶ 7).

- Sergeant Flores stopped spraying Wilson with O.C. spray once Wilson was subdued. (Wilson's Depo at 37:18- 20; Doc. No. 51-11 at 2 ¶ 7).

- Sergeant Flores' involvement in the incident concluded once Wilson was escorted to the holding cell. (Doc. No. 51-11 at 2 ¶ 9).

- The whole incident took approximately three minutes from the time that Wilson was initially attacked to when he was handcuffed. Hamilton Decl. Ex. E-G.

- The use of O.C. spray was reasonable under the circumstances. (Wilson's Depo at 37:21- 24).

- The decision by Sergeant Flores to use his O.C. spray was made in a good faith effort to restore order on the yard. (Wilson Depo. Tr. at 37:25 –38:3).

- The use of O.C. spray is not the basis of Wilson's Eighth Amendment claim. (Doc. No. 19 at 2).

- Defendant-Correctional Lieutenant C. Huckleberry did not observe the attacks. (Doc. No. 51-7 at 1 ¶ 3).

- Lieutenant Huckleberry's Incident Report was created after receiving reports from responding staff and watching the surveillance videos. (Doc. No. 51-7 at 2 ¶¶ 4-5).

- Lieutenant Huckleberry was not involved in escorting Wilson to the holding cell or monitoring him while he was there. (Doc. No. 51-7 at 2 ¶ 6).

- Lieutenant Huckleberry did not use force against Wilson. (Doc. No. 51-7 at 1 ¶ 3).

- Defendant-Correctional Sergeant E. Bucato did not use force against Wilson. (Doc. No. 51-3 at 2 ¶¶ 3-7).

- Correctional Officer O. Gonzalez handcuffed Wilson and conducted a clothed body search of his person, and afterwards escorted him to the Facility D patio, which began the decontamination process as they moved through fresh air. (Doc. No. 51-9 at 2 ¶ 7; Doc. No. 51-10 at 5)

- Decontamination from O.C. spray is accomplished by exposing the individual to fresh moving air, flushing the body with cool water, or providing clean clothing. (Doc. No. 51-9

10

at 2 ¶ 9; Doc. No. 51-10 at 3).

- Wilson decontaminated with cool, running water on the patio until he indicated he was done. (Wilson Depo. Tr. at 38:4–39:15, 43:10–44:1; Doc. No. 51-10 at 2 ¶ 7; Doc. No. 51-10 at 5).

- While decontaminating outside, Wilson continued to be exposed to fresh air. (Wilson Depo. Tr. at 39:25–40:4; Doc. No. 51-10 at 2 ¶ 10; Doc. No. 51-10 at 5).

- Officer Gonzalez escorted Wilson to the Facility D program holding cell for placement, and Wilson continued to be exposed to fresh moving air. (Wilson Depo. Tr. at 44:5-8; Doc. No. 51-10 at 2 ¶ 11; Doc. No. 51-10 at 5).

- At approximately 7:50 a.m., Officer Gonzalez placed Wilson in the holding cell, removed his handcuffs, and offered Wilson a set of clean clothing which he accepted. (Wilson Depo. Tr. at 45:19-46:2; Doc. No. 51-10 at 2 ¶¶ 11-12; Doc. No. 51-10 at 5).

- KVSP has three different types of holding cells: program holding cells, medical holding cells, and medical holding wet tanks. (Doc. No. 51-5 at 1-2 ¶ 3; Doc. No. 51-6 at 2-5).

- A holding cell is a secure structure located within a building or sheltered area that is without running water, a toilet, or sleeping facilities, and is designed for the interim placement of one or more offenders. (Doc. No. 51-5 at 1-2 ¶ 3; Cal. Code Regs. tit. 15, § 3268.2(g)).

- Holding cells at KVSP are smaller than wet tanks and only accommodate one inmate at a time. (Doc. No. 51-5 at 1-2 ¶ 3).

- The purpose of a holding cell is to provide temporary separation of an inmate who is disruptive, violent or his presence in an area threatens the safety and security of the institution from other inmates and staff, or to decontaminate an inmate from chemical agents. (Doc. No. 51-5 at 2 ¶ 4; Doc. No. 51-6 at 2-5).

- Because Wilson had just attacked other inmates, it would have been unsafe for Wilson to be placed in a wet tank with other inmates. (Doc. No. 51-5 at 3 ¶¶ 9-11).

- It also would have been unsafe to allow Wilson to go back to his cell. (Doc. No. 51-5 at 3 ¶ 11).

11

- Inmates who are involved in fights must be immediately separated and placed in detention. (Doc. No. 51-5 at 3 ¶ 11; Cal. Code Regs. tit. 15, § 3286).

- If the inmate poses an immediate threat to the safety of other inmates or endangers institutional security, the inmate shall immediately be removed from the General Population and placed in a Restricted Housing Unit. (Doc. No. 51-5 at 3 ¶ 11; Cal. Code Regs. tit. 15, § 3335(a)).

- Inmates that suffer from diagnosed psychiatric disorders who cannot function in the general population and do not require inpatient hospital care, but who require placement in restricted housing, are sent to a mental health crisis bed within the Enhanced Outpatient Program Restricted Housing Unit instead. (Doc. No. 51-5 at 3 ¶ 11; Cal. Code Regs. tit. 15, § 3335.2(a)).

- Wilson is a mental health patient. (Wilson Depo. Tr. at 55:10-15).

- Wilson remained in the holding cell until he could be moved to a mental health crisis bed. (Doc. No. 51-5 at 3 ¶ 11; Doc. No. 51-6 at 7).

- Inmates in the holding cell shall be checked on by custody staff every 15 minutes, and staff must record the time the inmate was checked, provide a brief comment of the interaction, and print and sign their name. (Doc. No. 51-5 at 2 ¶ 5; Doc. No. 51-6 at 2-5).

- Inmates must also be offered water and toilet facilities at reasonable intervals not to exceed one hour. (Doc. No. 51-5 at 2 ¶ 5; Doc. No. 51-6 at 2-5).

- Bucato monitored Wilson the entire time that he was in the holding cell. (Doc. No. 1 at 3; Wilson Depo. Tr. at 41:12-15, 50:11- 12; Doc. No. 51-3 at 2 ¶¶ 7-9; Doc. No. 51-4 at 4-5).

- Bucato noted on the holding cell log that Wilson's behavior/disposition was calm while he was in the holding cell. (Doc. No. 51-4 at 4-5).

- Bucato offered Wilson water and toilet facilities at least eight times, every 15 minutes. (Doc. No. 51-3 at 2 ¶ 10; Doc. No. 51-4 at 4-5).

- Bucato noted on the holding cell log that he offered Wilson water and toilet facilities every 15 minutes. (Doc. No. 51-3 at 2 ¶ 10; Doc. No. 51-4 at 4-5).

- As indicated in the comments section of the holding cell log, Wilson refused water and

12

toilet facilities each time it was offered. (Doc. No. 51-3 at 2 ¶ 10, Doc. No. 51-4 at 4-5).

- Placement in a holding cell for more than four hours requires approval by the facility Captain, and approval must be noted on the holding cell log. (Doc. No. 51-5 at 2 ¶ 4; Doc. No. 51-6 at 2-5).

- Wilson remained in the holding cell for approximately six and a half hours. (Doc. No. 1 at 3; Wilson Depo. Tr. at 47:1-3, 55:1-2; Doc. No. 51-4 at 4-5).

- Correctional Captain Christopher Stanley approved Wilson's prolonged placement in the holding cell and signed the holding cell log. (Doc. No. 51-5 at 4 ¶ 13; Doc. No. 51-4 at 4-5).

- The reason for exceeding the four-hour limit was because Wilson was pending placement in a mental health crisis bed. (Doc. No. 51-5 at 3-4 ¶¶ 9, 13; Doc. No. 51-4 at 4-5).

- At 8:55a.m., while in the holding cell, Wilson was evaluated by a registered nurse who completed a CDCR Form 7219 Medical Report of Injury or Unusual Occurrence. (Doc. No. 51-15 at 2 ¶ 4; Doc. No. 51-16 at 2).

- Licensed nursing staff must complete and submit a CDCR 7219 form upon conducting a medical evaluation after a use of force incident. (Doc. No. 51-15 at 1-2 ¶ 2; DOM § 51020.17.6).

- The CDCR 7219 form documents the reason for the report, when the inmate is evaluated, who they are evaluated by, any comments they make about the circumstances of their injury, and any pain or injuries they claim to have. (Doc. No. 51-15 at 1-2 ¶ 2).

- The CDCR 7219 form shall be completed and submitted to the Response Supervisor prior to the Licensed Nursing Staff leaving the institution. (Doc. No. 51-15 at 1-2 ¶ 2; DOM § 51020.17.6).

- When completing a CDCR 7219 form, nursing staff will only note injuries that the nurse can visibly see, or injuries and pain that the inmate complains of. (Doc. No. 51-15 at 2¶ 9).

- Treatment of injuries may supersede the need to decontaminate from the effects of O.C. spray. (Doc. No. 51-15 at 1-2. ¶ 2; DOM § 51020.15.4).

13

- The CDCR 7219 form reflects that no injuries were found on Wilson, that Wilson was sprayed with a chemical agent to his face, decontaminated with water and air, and received a staff-issued exposure packet and instructions for how to self-decontaminate. (Doc. No. 51-15 at 2 ¶ 7; Doc. No. 51-16 at 2).
- At approximately 2:25pm, Wilson was moved to a mental health crisis bed. (Wilson Depo. Tr. at 49:5-10; Doc. No. 51-5 at 3 ¶¶ 9, 12; Doc. No. 51-6 at 7).
- Wilson received a rules violation for this incident for battery with a deadly weapon and pleaded guilty. (Wilson Depo. Tr. at 35:4-6).
- Wilson has been pepper sprayed approximately 30-40 times while in CDCR custody before the incident at issue in this case. (Wilson Depo. Tr. at 41:19-25).
- The prior times Wilson was pepper sprayed were worse than this incident. (Wilson Depo. Tr. at 55:1-7).
- Wilson was pepper sprayed at least one other time after this incident. (Wilson Depo. Tr. at 42:12-17).

**B. Excessive Force**

Following Plaintiff's involvement in an inmate altercation, Sergeant Flores deployed pepper spray to subdue him. (Doc. No. 51-8). Nonparty Officer Gonzalez subsequently handcuffed Plaintiff and escorted him through fresh air to the Facility D patio, initiating the decontamination process. (Doc. No. 51-9 at 2 ¶ 7; Doc. No. 51-10 at 5). In accordance with CDCR policy, Plaintiff was provided with cool, running water to decontaminate until he indicated the process was complete. (Wilson Depo. Tr. at 38:4–39:15, 43:10–44:1; Doc. No. 51-10 at 2 ¶ 7). During this time, Plaintiff also remained exposed to fresh air. (Wilson Depo. Tr. at 39:25–40:4; Doc. No. 51-10 at 2 ¶ 10).

At approximately 7:50 a.m., less than minutes after the incident concluded, Officer Gonzalez placed Plaintiff in a holding cell, removed his restraints, and provided clean clothing, which Wilson accepted. (Wilson Depo. Tr. at 45:19–46:2; Doc. No. 51-10 at 2 ¶¶ 11–12). Due to the recent assaultive conduct, staff determined that placing Plaintiff in a wet tank with other inmates would pose a safety risk. (Doc. No. 51-5 at 3 ¶¶ 9–11). Plaintiff remained in the holding

cell pending transfer to a mental health crisis bed.  (Doc. No. 51-5 at 3 ¶ 11; Doc. No. 51-6 at 7).

During this period, Officer Bucato continuously monitored Plaintiff and documented his behavior as calm.  (Wilson Depo. Tr. at 41:12–15, 50:11–12; Doc. No. 51-3 at 2 ¶¶ 7–9; Doc. No. 51-4 at 4–5).  Pursuant to CDCR policy, Bucato offered Plaintiff water and access to toilet facilities at 15-minute intervals, all which Plaintiff declined.  (Doc. No. 51-3 at 2 ¶ 10; Doc. No. 51-4 at 4–5).

Plaintiff remained in the holding cell for approximately six and a half hours. (Wilson Depo. Tr. at 47:1–3, 55:1–2).  Although this exceeded the standard four-hour limit, the extension was authorized by Correctional Captain Stanley due to Plaintiff's pending placement in a crisis bed.  (Doc. No. 51-5 at 3–4 ¶¶ 9, 13; Doc. No. 51-4 at 4–5.

At 8:55 a.m., Plaintiff was evaluated by a registered nurse, who completed a CDCR Form 7219.  The form noted no injuries, confirmed exposure to a chemical agent, and documented that Wilson had been decontaminated with water and air. (Doc. No. 51-15 at 2 ¶ 4; Doc. No. 51-16 at 2). Wilson also received an exposure packet with instructions for self-decontamination.  (Doc. No. 51-15 at 2 ¶¶ 4, 7; Doc. No. 51-16 at 2).  At approximately 2:25 p.m., Plaintiff was transferred to a mental health crisis bed. (Wilson Depo. Tr. at 49:5–10; Doc. No. 51-5 at 3 ¶¶ 9, 12; Doc. No. 51-6 at 7).

Here, because the undisputed evidence establishes that Plaintiff was provided with sufficient opportunity to decontaminate, Plaintiff fails to state a claim for use of excessive force for the events following the use of O.C. spray.  *Wilson v. Laureano*, No. 3:22CV692 (DJN), 2024 WL 1683616, at *11 (E.D. Va. Apr. 18, 2024) (granting defendants motion for summary judgment and finding no excessive use of force when the undisputed facts show plaintiff has access to running water to decontaminate with and given clean clothing); *Goss v. Larry*, No. 220CV02978JFAMGB, 2021 WL 5332512, at *9 (D.S.C. Oct. 12, 2021) (plaintiff being offered running water immediately after being sprayed, given clean clothing to change into to, and being treated by a nurse were sufficient decontamination procedures and did not amount to excessive use of force), *report and recommendation adopted*, No. 2:20-CV-2978-JFA-MGB, 2021 WL 5330633 (D.S.C. Nov. 16, 2021)  *Brown v. Walker*, No. 9:09-CV-3064-RMG-BM, 2010 WL

4484185, at * 5 (D.S.C. Oct. 6, 2010) (finding no constitutional violation where inmate was provided running water to wash off chemical spray), *adopted by* 2010 WL 4482100 (D.S.C. Nov. 1, 2010); *Cf. Headwaters Forrest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130-31 (9th Cir. 2002) ("[I]t would have been clear to any reasonable officer that defendants' refusal to wash out the protesters' eyes with water constituted excessive force under the circumstances."). Accordingly, the Court recommends that the District Court grant Defendants' MSJ on the excessive force claim.

### C. Medical Deliberate Indifference

For the reasons outlined *supra*, the undisputed record reflects that CDCR staff provided Plaintiff with multiple opportunities to decontaminate from the O.C. spray on July 19, 2022. At no time did any of the named Defendants delay the decontamination process or fail to provide Plaintiff with an opportunity to decontaminate. Therefore, the Court finds no genuine dispute of material fact that Defendants were deliberately indifferent to Plaintiff's decontamination related treatment. *See Shapley*, 766 F.2d at 407 (a delay in treatment, without more, is insufficient to state a deliberate indifference claim); *see also Jett*, 439 F.3d at 1096 (a prisoner must provide sufficient evidence of the "harm caused by the [the prison official's] indifference" to establish a deliberate indifference claim). Accordingly, the Court recommends that the District Court grant Defendants' MSJ on the deliberate medical indifference claim.

### D. Qualified Immunity

In the alternative, Defendants assert that they are entitled to qualified immunity in this case because no official in their position would believe that their conduct violated Plaintiff's constitutional rights under the circumstances.

A government official is entitled to qualified immunity under Section 1983 unless (1) the official "violated a federal statutory or constitutional right, and (2) the unlawfulness of his conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). To demonstrate that a right was "clearly established" requires a showing that the statutory or constitutional question was "beyond debate," such that every reasonable official

16

would understand that what he is doing is unlawful. *Wesby*, 138 S. Ct. at 589; *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018). This standard is "demanding" and protects "all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at 589 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[A] court typically should identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the constitutional right at issue." *S.B v. County of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017)). "Even when no case is 'directly on point,' courts may compare relevant factors to determine whether every reasonable officer should have known the conduct in question was unlawful." *Anderson v. Virga*, 2018 WL 1556806, *2 (E.D. Cal. Mar. 30, 2018) (citing *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946–47 (9th Cir. 2017). The plaintiff bears the burden of establishing that the right alleged was clearly established. *Moran v. Washington*, 47 F.3d 839, 844 (9th Cir. 1998).

As discussed *supra*, the Court finds the undisputed facts show that Plaintiff failed to put forth sufficient evidence to establish a claim for excessive use of force or medical deliberate indifference against any Defendant. Thus, because the Court finds no constitutional violation, the Court need not address the second prong.

Accordingly, it is **RECOMMENDED**:

1. The District Court **GRANT** Defendants' motion for summary judgment (Doc. No. 51).

2. Judgment be entered in Defendants' favor and the case closed.

### NOTICE TO PARTIES

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. *Id*.; Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen (15) pages**. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014). These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals. ***Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.***

Dated:     March 11, 2026

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE